**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **FATIMA M. SILVA,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL NO.** |
| | : | **3:07-cv-1246 (VLB)** |
| **TOWN OF MONROE ET AL.,** | : | |
| **Defendants.** | : | **February 16, 2010** |

<u>**MEMORANDUM OF DECISION GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [Doc. # 89]**</u>

The Plaintiff, Fatima M. Silva, brought this action *pro se* for damages as well as injunctive and declaratory relief against the Defendants, the Town of Monroe, Connecticut; the Trumbull/Monroe Health District; Andrew Nunn, First Selectman for the Town of Monroe; and Thomas Monks, Sanitarian for the Town of Monroe and, more recently, District Sanitarian for the Trumbull/Monroe Health District. The Plaintiff asserts claims pursuant to 42 U.S.C. § 1983, alleging that the Defendants violated her constitutional rights by denying her a Permanent Certificate of Occupancy for a poolroom/sunroom she built on her property. The Plaintiff also asserts a Fifth Amendment claim for unconstitutional taking of her property, a conspiracy claim pursuant to 42 U.S.C. § 1985, and a Connecticut state law claim for intentional infliction of emotional distress. Presently pending before the Court is the Defendants' motion for summary judgment. For the reasons that follow, the Defendants' motion is GRANTED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The following facts relevant to the Defendants' motion for summary judgment are undisputed unless otherwise noted.  The Plaintiff owns and resides at a house located at 40 Stoneybrook Drive in Monroe, Connecticut.  Defendant Monks was, at all times relevant to this case, the Sanitarian for the Town of Monroe and, since its establishment in 2004, the District Sanitarian for the Trumbull/Monroe Health District (the "Health District").  Sometime prior to April 30, 1993, the Plaintiff built a poolroom/sunroom and in-ground pool on her property without obtaining permits from the Town of Monroe.  On or about April 30, 1993, the Plaintiff applied for permits for a poolroom/sunroom and in-ground pool, and the Town of Monroe issued the permits to the Plaintiff.  The Plaintiff claims that, after the permits were issued, Monks approached her on her property and indicated that he would not sign off on a Permanent Certificate of Occupancy for the poolroom/sunroom unless she would "go out with" him.  Silva Dep. at 24.  The Plaintiff asserts that she requested a Permanent Certificate of Occupancy on at least ten occasions between 1994 and 1998, but Monks refused to sign off on each occasion because the Plaintiff had rebuffed his advances.

According to the Plaintiff, Monks again sexually harassed her in 1999 or 2000 during a visit to her property when he edged close to her and touched her hair.  Monks did not say anything at this time.  The Plaintiff further testified that Monks most recently made a sexual advance on her in November 2005, when he said to her at the Town Hall, "You know what it will take to have me sign it."  Silva Dep. at 27.  At his deposition, Monks denied that he made any sexual advances on

2

the Plaintiff.  In addition, Monks stated that he did not recall the Plaintiff requesting a Permanent Certificate of Occupancy during the 1994-1998 time period, and that he probably would have signed one if it was presented to him. Monks Dep. at 234.  The Plaintiff claims that she sent a letter to the Town of Monroe in 2006 complaining of Monks' "inappropriate misconduct," but she was unable to provide a copy of the letter and could not recall specifically what she wrote in the letter.  Silva Dep. at 30-31.  The Town of Monroe, Nunn, and the Health District deny receiving the letter and claim that they were unaware of any allegation of sexual harassment against Monks until they received a copy of the Plaintiff's original complaint in this action.  <u>See</u> Nunn Aff. ¶¶ 6-7; Sulik Aff. ¶ 17.

On June 2, 1998, the septic system located at 40 Stoneybrook Drive in the Town of Monroe failed, causing sewage effluence over the leeching system at the Plaintiff's property.  The Plaintiff alleges that the septic system failure occurred as a result of the Town of Monroe's diversion of water from Route 110 and homes upstream onto her property.  On March 2, 1999, the septic system failure was identified on the Plaintiff's property by the Defendants.  On March 30, 1999, the Plaintiff tendered a written request to the Building Department asking that a Permanent Certificate of Occupancy be issued for her poolroom/sunroom, and attaching documents that had previously been requested by the Building Department and were needed before a Permanent Certificate of Occupancy could be issued.  On the same date, James Sandor, Chief Building Official for the Town of Monroe, generated a letter to be signed by the Building Department, the Zoning Department and the Town Sanitarian which confirmed that the poolroom/sunroom

3

conformed with Building Codes and Town regulations.  See Sandor Aff. ¶ 15 and Exhibits thereto.  However, the Zoning Department and Monks, as Town Sanitarian, did not sign the letter generated by Sandor because of the pending septic failure on the Plaintiff's property.

On or about April 11, 1999, a Notice of Violation was issued to the Plaintiff and her husband, Manuel Silva, regarding the septic system failure identified on their property on March 2, 1999.  On August 20, 1999, the Silvas personally installed two drywells that are six feet deep, which were designed to prevent septic system failures by collecting gray water from their washing machine.  The Silvas did not obtain a permit to install the drywells either prior to or after the installation.  On August 27, 1999, a Notice of Violation was issued by the Town of Monroe for the installation of the two gray water systems.  The violation was issued because the gray water systems were installed without a permit, not according to code, without a site investigation, and by an unlicensed person.  See Monks Aff., Ex. B.  The August 27, 1999 violation is still pending on the Plaintiff's property.

In June of 2006, the Silvas requested a Permanent Certificate of Occupancy from the Trumbull/Monroe Health District for the poolroom/sunroom they had installed in 1993.  On June 19, 2006, the Health District denied the Silvas' request.  According to the Defendants, the request was denied because the Silvas had failed to comply with the Notice of Violation issued on August 27, 1999.  The Defendants claim that it is the Health District's policy not to sign a Certificate of Occupancy if there is a current violation on a property.  See Maskara Dep. at 76.

4

On or about June 20, 2006, the Silvas appealed the Health District's decision denying them a Permanent Certificate of Occupancy to the Connecticut Department of Public Health.  On January 5, 2007, after hearing evidence and argument, the Commissioner of the Department of Public Health issued a Proposed Memorandum of Decision upholding the Health District's denial of the Silvas' request for a Permanent Certificate of Occupancy.  On July 3, 2007, the hearing officer issued a Memorandum of Decision upholding the Health District's denial of the Silvas' request for a Permanent Certificate of Occupancy.  The Department of Public Health ruled that the Health District had properly denied the Plaintiff's request for a Permanent Certificate of Occupancy because the Plaintiff had failed to establish that she resolved the violations identified in the August 27, 1999 Notice of Violation.  See Sulik Aff., Ex. B.

On August 15, 2007, the Plaintiff filed suit in this Court on the basis of federal question jurisdiction.  The Defendants filed the instant motion on July 10, 2009, and the Plaintiff filed her opposition thereto on August 13, 2009.

## II. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment.'"  <u>Bouboulis v. Transp. Workers Union of Am.</u>, 442 F.3d 55, 59 (2d Cir. 2006) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

The moving party bears the burden of showing that no genuine issues exist as to any material facts.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-25 (1986). If the moving party meets its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor."  <u>Burt Rigid Box, Inc.</u> <u>v. Travelers Prop. Cas. Corp.</u>, 302 F.3d 83, 91 (2d Cir. 2002).  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  <u>Western World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted).  A party also may not rely on conclusory statements or unsupported allegations that the evidence in support of the motion for summary judgment is not credible.  <u>Ying Jing Gan v. City</u> <u>of New York</u>, 996 F.2d 522, 532 (2d Cir. 1993).

The court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." <u>Huminski v. Corsones</u>, 396 F.3d 53, 69-70 (2d Cir. 2004).  "[I]f there is any evidence

in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." <u>Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH</u>, 446 F.3d 313, 315 (2d Cir. 2006).

"The same standards apply to a *pro se* litigant, but such a litigant is given special latitude in responding to a summary judgment motion." <u>Ricks v. O'Hanlon</u>, No. 07 Civ. 9849(WHP), 2010 WL 245550, at *3 (S.D.N.Y. Jan. 19, 2010) (internal quotation marks omitted).  The Court must "liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." <u>Bertin v. United States</u>, 478 F.3d 489, 491 (2d Cir. 2007) (internal quotation marks omitted).

## B.  <u>42 U.S.C. § 1983 Claims Against Municipality</u>

As an initial matter, the Court addresses the availability of a 42 U.S.C. § 1983 cause of action against the Town of Monroe and the Health District.  In <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658, 694 (1978), the United States Supreme Court held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is liable under § 1983."  The holding of <u>Monell</u> applies to municipalities, such as the Town of Monroe, as well as other local governmental bodies, such as the Health District.  <u>See</u>, <u>e.g.</u>, <u>Back v. Hastings On Hudson Union Free School Dist.</u>, 365 F.3d 107, 128 (2d Cir. 2004) (school district is a local

governmental body and therefore can only be held liable under § 1983 if its policy or custom inflicts the injury complained of).

The Plaintiff may satisfy the "policy or custom" requirement of <u>Monell</u> by demonstrating "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a 'custom or usage' sufficient to impute constructive knowledge of the practice to policymaking officials; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to a 'deliberate indifference' to the rights of those who come in contact with the municipal employees." <u>Dunbar v. County of Saratoga</u>, 358 F. Supp. 2d 115, 133-34 (N.D.N.Y. 2005) (internal citations omitted). "Additionally, a plaintiff must show a causal link between an official policy or custom and [her] injury in order for the court to find liability against the municipality." <u>Id.</u>

Here, the Plaintiff has neither alleged nor presented any evidence that the Town of Monroe or the Health District established or sanctioned a policy, custom, or practice that authorized their employees to engage in sexual harassment by withholding or threatening to withhold services in exchange for a Town resident's refusal to date an employee, or otherwise. To the contrary, the evidence in the record demonstrates that the Town of Monroe and the Health District have specific policies prohibiting sexual harassment by their employees. <u>See</u> Nunn Aff. ¶ 5; Monks Aff. ¶ 22; Sulik Aff. ¶ 18 and Exhibits D and E thereto. Nor has the Plaintiff provided evidence sufficient to demonstrate that the Town of Monroe or the Health

8

District failed to train or supervise Monks to such an extent that it amounted to a "deliberate indifference" to the rights of those who came into contact with him. Furthermore, there is no objective evidence in the record that the Town of Monroe or the Health District were even aware of the Plaintiff's allegations of sexual harassment against Monks until the filing of this action.  Notably, there is no mention of allegations of sexual harassment in the Department of Public Health's July 3, 2007 Memorandum of Decision.  While the Plaintiff claimed during her deposition that she sent a letter to the Town of Monroe sometime in 2006 complaining of Monks' "inappropriate misconduct," neither she nor the Defendants were able to locate a copy of the letter, and she was unable to recall specifically what she wrote in the letter.  See Silva Dep. at 30-31. Accordingly, the Plaintiff's claims against the Town of Monroe and the Health District must be dismissed.

### C. 42 U.S.C. § 1983 Claims Against First Selectman Nunn

The United States Supreme Court and Second Circuit have held that "a § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself."  Coon v. Town of Springfield, 404 F.3d 683, 687 (2d Cir. 2005) (citing Brandon v. Holt, 469 U.S. 464 (1985)).  The Plaintiff's allegations against Nunn are brought against him in his capacity as First Selectman for the Town of Monroe only, and therefore, the real party in interest is the Town of Monroe.  As discussed above, however, all claims against the Town of Monroe are barred by Monell.

9

Moreover, assuming that the Plaintiff is attempting to assert a claim against Nunn in his individual capacity, such a claim must still fail.  "An individual cannot be held liable for damages under § 1983 merely because he held a high position of authority, but can be held liable if he was personally involved in the alleged deprivation."  Back, 365 F.3d at 127 (internal quotation marks omitted).  Personal involvement can be shown by:

> evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

Id.

It is undisputed that Nunn did not participate directly in the alleged constitutional violations.  Nunn also did not create a policy or custom under which unconstitutional practices occurred.  Instead, the Town of Monroe has policies specifically prohibiting sexual harassment by its employees.  As stated above, while the Plaintiff claims to have sent a letter to the Town of Monroe sometime in 2006 complaining of Monks' "inappropriate misconduct," there is no record of the letter and the Plaintiff was unable to recall specifically what she wrote in the letter.  See Silva Dep. at 30-31.  Therefore, there is no evidence from which a reasonable jury could conclude that Nunn and the Town of Monroe were even aware of the Plaintiff's allegations of sexual harassment against Monks until she filed her

10

original complaint in this action, and a claim of supervisory liability against Nunn must fail.

Finally, even if the Plaintiff could establish a § 1983 claim against Nunn, he would be protected by qualified immunity to the extent the Plaintiff asserts a § 1983 claim for damages against him.  As this Court (Burns, J.) has explained, "The defense of qualified immunity shields government agents from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Smith v. City of New Haven, 166 F. Supp. 2d 636, 641 (D. Conn. 2001).  "A defendant will be entitled to qualified immunity if either (1) his actions did not violate clearly established law or (2) it was objectively reasonable for him to believe that his actions did not violate clearly established law."  Iqbal v. Hasty, 490 F.3d 143, 176 (2d Cir. 2007), rev'd on other grounds, Ashcrof v. Iqbal, 129 S.Ct. 1937 (2009).

Here, it was objectively reasonable for Nunn to believe that his denial of the Plaintiff's request for a Permanent Certificate of Occupancy for her poolroom/sunroom did not violate clearly established law.  The undisputed evidence in this case demonstrates that there has been a pending violation on the Plaintiff's property since August 27, 1999 due to her illegal installation of two gray water systems.  Pursuant to Health District policy, the Plaintiff's request for a Permanent Certificate of Occupancy was denied because of the pending violation on her property.  See Maskara Dep. at 76.  The Connecticut Department of Public Health upheld the Health District's denial of the Plaintiff's request for a Permanent Certificate of Occupancy by Memorandum of Decision dated July 3, 2007, on the

basis that the Plaintiff had failed to address the August 27, 1999 violation.  See
Sulik Aff., Ex. B.  In light of the Health District's policy of not granting a Permanent
Certificate of Occupancy if there is a pending violation on the subject property, a
policy that was upheld by the Connecticut Department of Public Health, Nunn's
actions were objectively reasonable.  Therefore, Nunn is entitled to qualified
immunity.

### D.  42 U.S.C. § 1983 Claims Against Monks

#### 1.  Statute of Limitations

The Defendants argue that the Plaintiff's 42 U.S.C. § 1983 claims should be
dismissed to the extent that they rely upon acts that occurred after expiration of
the applicable statute of limitations.  The United States Supreme Court and the
District of Connecticut have held that the statute of limitations for actions brought
pursuant to § 1983 is calculated according to the personal injury statute of
limitations in the state in which the tort is alleged to have occurred.  See Vaden v.
Connecticut, 557 F. Supp. 279, 283 (D. Conn. 2008) (citing Wilson v. Garcia, 471
U.S. 261, 280 (1985)).  In Connecticut, the statute of limitations for tort claims is
three years.  See Conn. Gen. Stat. § 52-577.  The Second Circuit has specifically
held that the three-year statute of limitations set forth in Conn. Gen. Stat. § 52-577
is applicable to § 1983 claims.  See Loundsbury v. Jeffries, 25 F.3d 131, 134 (2d
Cir. 1994).

The Plaintiff testified during her deposition that Monks sexually harassed
her on three occasions between 1994 and 2005.  She claimed that the first incident
occurred in the early 1990s, when Monks informed her while in her poolroom that

12

if she wanted a Permanent Certificate of Occupancy, she would have to go out with him.  Silva Dep. at 24.  She testified that the second incident occurred in 1999 or 2000 when Monks, while on her property, edged close to her and touched her hair.  Id. at 26-27.  Finally, she claimed that the third incident occurred while she and Monks were in a hallway at Town Hall, and he said to her "You know what it will take to have me sign it."  Id. at 27.  The Plaintiff interpreted this statement to mean that if she would go out with him, he would sign off on her Permanent Certificate of Occupancy.  According to the Plaintiff, she requested a Permanent Certificate of Occupancy from Monks on at least ten occasions between 1994 and 1998, but Monks refused to sign off each time because she had rebuffed his advances.  The record reflects that the first time the Plaintiff tendered a written request for a Permanent Certificate of Occupancy was on March 30, 1999, when she sent a letter along with requested documentation to the Building Department.  See Sandor Aff. ¶ 15 and Exhibits thereto.  However, the Zoning Department and Monks, as Town Sanitarian, did not sign off on the Plaintiff's request because there was an unresolved septic system failure on her property at the time.  The record further reflects that the next and final time that the Plaintiff requested a Permanent Certificate of Occupancy was in June of 2006, which was ultimately denied by the Health District because there was a pending violation on her property.

The Plaintiff filed suit on August 15, 2007, and therefore all claims she asserts based upon the two earlier incidents of alleged sexual harassment and Monks' denials of her request for a Permanent Certificate of Occupancy between

13

1994-1999 are barred by the three-year statute of limitations applicable to 42 U.S.C. § 1983 claims.

The Plaintiff argues that the statute of limitations should be tolled based upon the continuing course of conduct doctrine because Monks is a public servant and has a duty to enforce the health code within his health district.  To support a finding of a continuing course of conduct under Connecticut law, "there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto."  Argus Research Group, Inc. v. Argus Media, Inc., 562 F. Supp. 2d 260, 281 (D. Conn. 2008) (quoting Neuhaus v. DeCholnoky, 905 A.2d 1135, 1143 (Conn. 2006)).  Where courts have held "that a duty continued to exist after cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act."  Id.  However, the continuing course of conduct doctrine has been found inapplicable where the plaintiff was aware of the alleged violation yet failed to file suit to enforce her claims.  See S. Pope Inc. v. Pope Exterminating, No. 66712, 1993 WL 489708, at *2 (Conn. Super. Ct. Nov. 17, 1993) (citing Beckenstein v. Potter & Carrier, Inc., 464 A.2d 18, 25 (Conn. 1983)).

Here, the Defendants have submitted the affidavit of James Sandor, Chief Building Official for the Town of Monroe, along with supporting documentation establishing that, at some point after granting the Plaintiff a building permit for her poolroom/sunroom on May 17, 1993, the Building Department had requested specific documents from the Plaintiff that were needed before a Permanent

14

Certificate of Occupancy could be issued.  Sandor Aff. ¶ 15.  As Sandor's Affidavit attests, the Building Department was responsible for creating the Permanent Certificate of Occupancy and circulating it to the Zoning Enforcement Department and the Town Sanitarian for their approval.  Id. ¶ 16.  The Plaintiff did not provide the necessary documentation until March 30, 1999, at which time Sandor drafted a Permanent Certificate of Occupancy and sent it to Thomas Brandt at the Zoning Enforcement Department and to Monks as Town Sanitarian for their approval.  Id. ¶ 18.  The Plaintiff has presented no evidence to rebut Sandor's Affidavit.  Since Monks did not have an opportunity to sign off on the Permanent Certificate of Occupancy until it was generated by the Building Department on March 30, 1999, he could not have breached a duty to the Plaintiff before that date.  Moreover, the Plaintiff was obviously aware of the alleged violations forming the basis of her claims when they occurred during the 1994-1999 time period, but she failed to file suit in this Court until August 15, 2007.  Accordingly, the continuing course of conduct doctrines does not apply on the facts of this case, and the Plaintiff's claims based upon incidents that took place during 1994-1999 are time-barred.[1]

---

[1]  Although the parties do not address it, the "continuing violation theory" under federal law similarly provides that a statute of limitations does not begin to run until the last act alleged to be a part of an ongoing course of unlawful conduct occurs.  See Doe v. Blake, 809 F. Supp. 1020, 1025 (D. Conn. 1992).  However, "[a] plaintiff's case will be successful under a continuing violation theory only if he or she can show more than the occurrence of isolated or sporadic acts."  Id. (internal citations omitted).  Here, the Plaintiff bases her claims upon three sporadic instances of alleged sexual harassment, occurring over the course of eleven years.  In addition, although the Plaintiff claims she asked Monks for a Permanent Certificate of Occupancy on ten occasions between 1994 and 1998, she failed to provide the necessary paperwork to the Building Department until March 30, 1999, and then failed to request a Certificate from the Health District until June of 2006.

## 2. Due Process

The Plaintiff alleges that the Defendants' denial of her Permanent Certificate of Occupancy violated her substantive due process rights. "Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999). The Second Circuit has explained, in the context of land regulations and enforcement, that:

> [T]his court is always mindful of the general proscription that federal courts should not become zoning boards of appeal to review nonconstitutional land use determinations by the Circuit's many local legislative administrative agencies. Given this concern, a party asserting a deprivation of substantive due process must first establish a valid property interest within the meaning of the Constitution. Second, the party must demonstrate that the defendant acted in an arbitrary or irrational manner in depriving [her] of that property interest.

Crowley v. Courville, 76 F.3d 47, 52 (2d Cir. 1996) (internal citations and quotation marks omitted).

Because the Court has held that the Plaintiff's claims based upon incidents that occurred during the 1994-1999 time frame are barred by the applicable statute of limitations, the only remaining incident that could form the basis of the Plaintiff's due process claim is the Health District's denial of her request for a Permanent Certificate of Occupancy in June of 2006. The Plaintiff claims that her request was denied because she refused to go out with Monks. However, the undisputed evidence shows that there has been a pending violation on the

---

Accordingly, the continuing violation theory does not apply on the facts of this case.

Plaintiff's property since August 27, 1999 due to her illegal installation of two gray water systems.  Pursuant to Health District policy, the Plaintiff's request for a Permanent Certificate of Occupancy was denied because of the pending violation on her property.  Monks and other Health District employees have advised the Plaintiff that she must address the August 27, 1999 violation before they will sign off on the Permanent Certificate of Occupancy.  See Monks Aff. ¶ 18; Sulik Aff. ¶ 16.  The Connecticut Department of Public Health upheld the Health District's denial of the Plaintiff's request for a Permanent Certificate of Occupancy by Memorandum of Decision dated July 3, 2007, on the basis that the Plaintiff had failed to address the August 27, 1999 violation.  Therefore, the evidence in the record demonstrates that there was a rational basis for the Health District's denial of the Plaintiff's Request for a Permanent Certificate of Occupancy in June of 2006.  The Plaintiff has not demonstrated that the Health District's policy of refusing to issue a Permanent Certificate of Occupancy if there is a violation pending on a property is arbitrary and capricious.  Therefore, the Plaintiff cannot prove her claim for violation of her substantive due process rights, and this claim must be dismissed.

### 3.  Equal Protection

The Plaintiff's amended complaint does not specifically allege a violation of the Equal Protection Clause.  However, in subsequent pleadings and discovery, the Plaintiff has indicated that she believes the Defendants have treated her differently than other Town of Monroe residents.  Therefore, the Court will consider whether her allegations form the basis of a claim for violation of the

17

Equal Protection Clause.  To the extent that the Plaintiff is asserting an equal protection claim, this claim appears to be of the "class of one" variety outlined in Village of Willowbrook v. Olech, 528 U.S. 562 (2000).  In that case, the Supreme Court recognized that successful equal protection claims may be brought by a class of one "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Id. at 564.  In so holding, the Olech Court explained that "the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  Id. (internal quotation marks omitted).

The Supreme Court held in Olech that the "class of one" standard applied where a village government asked a homeowner to grant a 33-foot easement to the village in return for access to the municipal water supply, while 15-foot easements were required of other similarly situated property owners.  The village later agreed to the 15-foot easement, which was sufficient to connect to the municipal water supply.  The Court found the complainant's allegations that (1) the village's demand was "irrational and wholly arbitrary;" (2) the village was later able to connect the water supply with a 15-foot easement; and (3) the plaintiff was treated differently than other similarly situated property owners were sufficient to state a claim under traditional equal protection analysis.  Id. at 565.

Here, the Plaintiff has not demonstrated that she was treated differently than

18

similarly situated property owners.  There is no evidence in the record indicating that other residents of the Town of Monroe were granted Permanent Certificates of Occupancy despite having pending violations on their property.  Furthermore, as discussed above, the Defendants' decision to withhold their approval of the Plaintiff's Permanent Certificate of Occupancy until she resolved the pending violation relating to her improper installation of gray water systems on her property was rationally-based and not arbitrary or capricious.  See Bizarro v. Miranda, 394 F.3d 82, 88-89 (2d Cir. 2005) ("an Olech-type equal protection claim focuses on whether the official's conduct was rationally related to the accomplishment of the work of their agency").  Accordingly, the Plaintiff's equal protection claim is dismissed.

### 4.  Sexual Harassment

The Plaintiff next asserts that Monks violated her civil rights by subjecting her to "quid pro quo" sexual harassment.  The Second Circuit has not specifically addressed whether quid pro quo sexual harassment is actionable under 42 U.S.C. § 1983.  However, the Second Circuit has held that "sexual harassment of women constitutes disparate treatment because of gender and is actionable under Section 1983."  Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 144 (2d Cir. 1993).  Because qui pro quo harassment is a recognized form of sexual harassment, other district courts within the Second Circuit have concluded that quid pro quo harassment is actionable under § 1983.  See, e.g., Ragin v. Newburgh Enlarged City School Dist., No. 06 Civ. 2797(SCR)(JFK), 2009 WL 4906111, at *5 n.2 (S.D.N.Y. Dec. 17, 2009).

19

In order to survive a summary judgment motion on her § 1983 claim for sexual harassment, the Plaintiff must proffer evidence that "(1) [Monks] was acting 'under color of state law' at the time he committed the conduct complained of, and (2) that his conduct deprived her of 'rights, privileges or immunities secured by the Constitution or laws of the United States.'"  Hayut v. State Univ. of New York, 352 F.3d 733, 743-44 (2d Cir. 2003).

The parties have not cited, and the Court is not aware of, any cases recognizing a § 1983 cause of action for sexual harassment in a context similar to the facts presented in this case.  Section 1983 claims for quid pro quo sexual harassment typically arise in the employment setting.  In such cases, courts apply the three-step burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973) in analyzing whether a plaintiff has established a case for sex discrimination under § 1983.  Under this framework, the plaintiff first bears the burden of establishing a prima facie case of sex discrimination.  To establish a prima facie case of quid pro quo sexual harassment, a plaintiff must "present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis of decisions affecting the compensation, terms, conditions, or privileges of her employment."  Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir. 1994).  Actionable unwelcome sexual conduct includes "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature."  Meritor Savings Bank, FSB v. Vinson, 457 U.S. 57, 65 (1986).

20

"Second, after the Plaintiff establishes the existence of a prima facie case, there is a presumption that the employer unlawfully discriminated against the employee, thus shifting the burden to the employer 'to articulate some legitimate nondiscriminatory reason for the employee's rejection.'"  <u>Ragin</u>, 2009 WL 4906111, at *8 (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802).  The defendant bears the burden of producing evidence "which, *taken* as *true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action."  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 509 (1993).

"Third, if the employer carries its burden, the burden shifts back to the employee to demonstrate that the legitimate reasons offered by the employer were a pretext for discrimination."  <u>Ragin</u>, 2009 WL 4906111, at *8 (citing <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981)).  A "plaintiff may demonstrate pretext by illuminating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons that would raise doubt in the factfinder's mind that the employer did not act for those reasons."  <u>Bogdan v. N.Y. City Transit Auth.</u>, No. 02 Civ. 09587, 2005 WL 1161812, at *8 (S.D.N.Y. May 17, 2005) (internal quotation marks omitted).

Assuming that a quid pro quo claim for sexual harassment under § 1983 is cognizable in the context of this case, analyzing the Plaintiff's claim under the rubric set forth in employment cases compels the conclusion that this claim cannot withstand summary judgment.  Because the Plaintiff's claims based upon alleged incidents of sexual harassment that occurred in the early 1990s and in 1999 or 2000 are time-barred, the sole remaining sexual harassment claim is

21

predicated upon Monks' alleged statement to the Plaintiff while in a hallway at Town Hall that "You know what it will take to have me sign it."  The Plaintiff interpreted this statement to mean that if she would go out with him, he would sign off on her Permanent Certificate of Occupancy.  The Plaintiff admitted that Monks did not ask her to perform any sexual acts, did not make any type of sexual gesture, and never asked her to have a sexual relationship or sexual intercourse with him in exchange for him approving her Permanent Certificate of Occupancy. Silva Dep. at 28-29.

The Court finds that Monks' ambiguous statement, which on its face was absent of any sexual connotation, is insufficient to establish a prima facie case of quid pro quo sexual harassment.  Moreover, even if the Plaintiff could establish a prima face case of sexual harassment, her claim would fail under the remaining steps of the McDonnell Douglas analysis.  Monks has articulated a legitimate reason for the Health District's denial of the Plaintiff's request for a Permanent Certificate of Occupancy, that reason being the violation that has been pending on her property since August 27, 1999.  The Plaintiff has provided no evidence to establish that this legitimate reason for the denial of her request was a pretext for discrimination.  Accordingly, the Plaintiff's § 1983 claim for sexual harassment is dismissed.

### E.  Unconstitutional Taking

The Plaintiff also alleges that the Defendants effected an unconstitutional taking of her property.  Specifically, she asserts that, during the 1997-1998 time period, the Defendants diverted runoff water from upstream tributaries onto her

property, amounting to an "unconstitutional taking of [her] property . . . in violation of 42 U.S.C. § 1983."  Am. Compl. ¶¶ 10, 35.  According to the Plaintiff, this diversion of water caused her septic tank to "explode," and has rendered her property "unmarketable and greatly reduced in value due to the alleged health and building code violations."  Id.  The Defendants have not challenged the ripeness of the Plaintiff's takings claim.  Nevertheless, because ripeness implicates federal subject matter jurisdiction, this Court must address the issue *sua sponte*.  See Gavlak v. Town of Somers, 267 F. Supp. 2d 214, 219 (D. Conn. 2003) ("Because subject matter jurisdiction remains an unwaivable *sine qua non* for the exercise of federal judicial power, it is this Court's obligation to address, *sua sponte*, this threshold question when it appears from the complaint that it might be lacking.") (internal citations and quotation marks omitted); see also Promisel v. First Am. Artificial Flowers, Inc., 943 F.2d 251, 254 (2d Cir. 1991) ("[T]he lack of subject matter jurisdiction may be raised at any time, by the parties, or by the court *sua sponte*.").

The Fifth Amendment to the United States Constitution provides, in relevant part, that "private property [shall not] be taken for public use, without just compensation."  The Constitutional proscription on uncompensated takings, which has come to be known as the "Just Compensation Clause," applies to the States through the Fourteenth Amendment.  See Chicago, B. & Q.R. Co. v. Chicago, 166 U.S. 226, 239 (1897); see also San Diego Gas & Electric Co. v. San Diego, 450 U.S. 621, 623, n.1 (1981).

23

In *Williamson County v. Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), the Supreme Court held that a property owner alleging a Fifth Amendment claim for taking of property must satisfy a two-prong test, demonstrating that (1) the state regulatory entity has rendered a "final decision" on the matter; and (2) she has sought just compensation by means of an available state procedure. The *Williamson* Court held that "a property owner has not suffered a violation of the Just Compensation Clause until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State for obtaining such compensation . . ." *Id.* at 195. A "taking" is not "without just compensation" within the meaning of 42 U.S.C. § 1983 unless the property owner has exhausted all state procedures that may provide just compensation, or has otherwise demonstrated that the state's procedures are inadequate or unavailable. *Id.* at 194-197; *see also Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 380 (2d Cir. 1995). Finally, it is irrelevant for the purposes of *Williamson* whether a taking is classified as regulatory or physical;[2] both varieties of a takings claim require the property owner to seek compensation in state court before the claim is considered to be ripe for decision in federal court. *Villager Pond*, 56 F.3d at 380.

---

[2]   "Physical takings . . . occur when the government physically takes possession of an interest in property for some public purpose." *Buffalo Teachers Fed. v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006). Regulatory takings "do not involve a categorical assumption of property" but instead involve a situation in which "the state regulation goes too far and in essence effects a taking." *Id.*

In Connecticut, an adequate procedure exists for property owners to obtain just compensation for a taking.  The Connecticut Supreme Court has determined that a legally sufficient procedure exists for a property owner to obtain just compensation for the alleged taking of property under Article First, § 11, of the Connecticut State Constitution, which states that "The property of no person shall be taken for public use, without just compensation."  See Melillo v. City of New Haven, 249 Conn. 138, 154 n. 28, 732 A.2d 133 (1999).  The procedure established by Article First, § 11 has been explicitly approved by both the Second Circuit and the District of Connecticut.  See Santini v. Conn. Hazardous Waste Mgmt. Serv., 342 F.3d 118, 126-27 (2d Cir. 2003), abrogated on other grounds, San Remo Hotel, L.P. v. San Francisco, 545 U.S. 323, 341-42 (2005); Villager Pond, 56 F.3d at 380; Katz v. Stannard Beach Ass'n, 95 F. Supp. 2d 90, 97-98 (D. Conn. 2000).

In the present case, the Plaintiff has not shown that she has made any attempt to obtain just compensation through a Connecticut state court proceeding or other regulatory process, nor has she demonstrated that the Connecticut procedures for obtaining compensation are inadequate or unavailable.  Consequently, the Plaintiff's Fifth Amendment takings claim is not ripe for adjudication in this Court and must be dismissed.[3]

---

[3]  To the extent that the Plaintiff is also attempting to assert a takings claim based upon the Defendants' refusal to grant her a Permanent Certificate of Occupancy for her poolroom/sunroom, the same reasoning applies to bar this claim.  Such a claim would also be barred because the Plaintiff has failed to demonstrate that the denial of her request has caused a discernable economic impact upon her or interfered with her investment-based expectations.  See Buffalo Teachers, 464 F.3d at 375.

## F.  42 U.S.C. § 1985 Conspiracy Claim

The Plaintiff further claims that the Defendants conspired to deprive her of her constitutional rights.  "A conspiracy claim under 42 U.S.C. § 1985(3) has four elements:  (1) a conspiracy, (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen."  Iqbal v. Hasty, 490 F.3d 143, 176 (2d Cir. 2007), rev'd on other grounds, Ashcrof v. Iqbal, 129 S.Ct. 1937 (2009).  "In addition, the conspiracy must be motivated by some class-based animus."  Id. at 70.

The Court holds that the Plaintiff's conspiracy claim must be dismissed, for several reasons.  First, the Plaintiff has provided no evidence, apart from her own conclusory allegations, that the Defendants conspired to deprive her of her civil rights.  Second, even if the Plaintiff had produced evidence of a conspiracy between the Defendants, her claim would still fail because a conspiracy between a single entity and its employees does not state a claim under 42 U.S.C. § 1985.  See Frooks v. Town of Cortland, 997 F. Supp. 438, 456 (S.D.N.Y. 1998) ("[T]o state a claim under 42 U.S.C. § 1985, a plaintiff must allege a conspiracy among a plurality of actors, because the defining element of a conspiracy - a plurality of actors committed to a common goal - is not satisfied by joint action . . . of a single entity. Thus, as a matter of law, plaintiffs do not state a claim for 'conspiracy' under section 1985, because they merely allege that a single entity - the Town - conspired with its employees to violate their constitutional rights.") (internal

26

citations and quotation marks omitted).  Finally, the Plaintiff has failed to allege or produce any evidence that the conspiracy she asserts was motivated by some class-based animus.

### G.  Intentional Infliction of Emotional Distress

Finally, the Plaintiff asserts a claim for intentional infliction of emotional distress.  To prevail on a claim for intentional infliction of emotional distress, the Plaintiff must prove:  "(1) that the [defendant] intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."  DeLaurentis v. New Haven, 220 Conn. 225, 266-67 (1991) (internal citations and quotation marks omitted).  The Connecticut Supreme Court has further explained that "[l]iability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind."  Id. at 267.

Having dismissed all of the Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over the Plaintiff's state law claim for intentional infliction of emotional distress pursuant to 28 U.S.C. § 1367(c).  See Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine - judicial economy, convenience, fairness, and comity - will point toward declining to exercise

27

jurisdiction over the remaining state-law claims.") (quoting <u>Carnegie-Mellon Univ.</u>

<u>v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988)); <u>Marcus v. AT&T Corp.</u>, 138 F.3d 46, 57 (2d

Cir. 1998) ("In general, where the federal claims are dismissed before trial, the

state claims should be dismissed as well.").  This case involves the Plaintiff's

challenge to local health and land use regulations, which are issues best resolved

by Connecticut state courts.  <u>See</u> <u>San Remo Hotel</u>, 545 U.S. at 347.[4]

### III.  CONCLUSION

Based upon the above reasoning, the Defendants' motion for summary

judgment is GRANTED.  The Clerk is directed to enter judgment for the

Defendants, and to close this case.

IT IS SO ORDERED.

_____/s/_____

Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  February 16, 2010.

---

[4]  To the extent that the Plaintiff's amended complaint attempts to state a
cause of action for negligence, or any other state law claims, based upon the
Defendants' diversion of water onto her property, the Court declines to exercise
supplemental jurisdiction over these claims as well.  As the Court has explained in
prior Orders, the Plaintiff may file claims regarding the Defendants' alleged
negligence in diverting water in Connecticut Superior Court.  <u>See</u> Doc. ## 52, 57,
79.

28